# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALDEN SULGER, Derivatively on Behalf of Nominal Defendants COMPASS DIVERSIFIED HOLDINGS, COMPASS GORUP DIVERSIFIED HOLDINGS LLC, and COMPASS GROUP MANAGEMENT LLC, | ) ) ) ) ) Case No. _____ ) ) JURY TRIAL DEMANDED |
| Plaintiff, | ) ) |
| v. | ) ) |
| ELIAS J. SABO, RYAN J. FAULKINGHAM, STEPHEN KELLER, PATRICK A. MACIARIELLO, ALEXANDER S. BHATHAL, JAMES J. BOTTIGLIERI, GORDON M. BURNS, HAROLD S. EDWARDS, LARRY L. ENTERLINE, NANCY B. MAHON, TERI R. SHAFFER, and HEIDI LOCKE SIMON, | ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| COMPASS DIVERSIFIED HOLDINGS, COMPASS GROUP DIVERSIFIED HOLDINGS LLC, and COMPASS GROUP MANAGEMENT LLC, | ) ) ) ) ) |
| Nominal Defendants. | ) ) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Alden Sulger ("Plaintiff"), by and through his undersigned attorneys, bring this

derivative complaint for the benefit of nominal defendants Compass Diversified Holdings,

Compass Group Diversified Holdings LLC, and Compass Group Management LLC

(collectively, "Compass" or the "Company"), against its Board of Directors (the "Board") and

certain of its executive officers seeking to remedy the Individual Defendants' (defined below)

breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Compass, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *Kelly v. Sabo*, 2:25-cv-06499-MRA-KES (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff on behalf of Compass against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least March 1, 2023, and May 7, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.    Incorporated in 2005, Compass Diversified Holdings is a Delaware statutory trust which owns all of the limited liability interests of Compass Group Diversified Holdings, LLC. Compass Group Management LLC is the manager of the Company.

3.    The Company was formed to acquire and manage a group of small and middle-market businesses headquartered in North America. Since its incorporation, the Company has

---

[1] The Individual Defendants are Elias J. Sabo ("Sabo"), Ryan J. Faulkingham ("Faulkingham"), Stephen Keller ("Keller"), Patrick A. Maciariello ("Maciariello"), Alexander S. Bhathal ("Bhathal"), James J. Bottiglieri ("Bottiglieri"), Gordon M. Burns ("Burns"), Harold S. Edwards ("Edwards"), Larry L. Enterline ("Enterline"), Nancy B. Mahon ("Mahon"), Teri R. Shaffer ("Shaffer"), and Heidi Locke Simon ("Simon"). "Defendants" means Compass and the Individual Defendants.

acquired and managed a number of consumer companies, including, *inter alia*: (i) The Honey Pot Co., a premium package goods brand for herb-based products; (ii) BOA Holdings, Inc. ("BOA"), the creator of the BOA Fit System, which is an outdoor, athletic, workwear, and bracing brand focused on performance improvements for athletes; and (iii) PrimaLoft Technologies Holdings, Inc. ("PrimaLoft"), a leading provider of branded, high-performance synthetic insulation primarily used in consumer outerwear and accessories.

4.     On September 3, 2021, the Company acquired a majority stake in Lugano Holdings, Inc. ("Lugano"), which is a California-based leading designer, manufacturer, and marketer of luxury jewelry, for $265 million.

5.     During the Relevant Period, the Company invested heavily in Lugano. In 2024, Lugano began purchasing inventory from a related party to one of its executive officers, which resulted in a drastic increase to Lugano's revenue. In turn, the Company began to report increased financial results.

6.     Throughout the Relevant Period, the Individual Defendants repeatedly touted the Company's internal controls over financial reporting and assured investors that the Company's financial statements were accurate, and that there were "no material changes" to its internal controls over financial reporting.

7.     However, in reality, Lugano's financial reporting was heavily distorted, which weakened the Company's internal controls and made the Company's financial statements inaccurate.

8.     The truth was revealed on May 7, 2025, when the Company issued a press release titled "Compass Diversified Discloses Non-Reliance on Financial Statements for Fiscal 2024 Amid an Ongoing Internal Investigation into its Subsidiary, Lugano Holding, Inc." (the "May 7

Press Release"). The May 7 Press Release announced the resignation of Lugano's long-time Chief Executive Officer ("CEO"), Mordechai Ferder, and revealed that the Company's investors should no longer rely on management's financial statements for the 2024 fiscal year.

9.      On this news, the Company's stock price fell $10.70 per share, or approximately 62%, to close at $6.55 per share on May 8, 2025.

10.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's internal controls over its financial reporting were defective; (ii) as a result, the Company's publicly issued financial statements contained material errors; (iii) Lugano violated Generally Accepted Accounting Principles ("GAAP") in its financing, accounting, and inventory practices during fiscal years 2022 through 2024; (iv) as a result of the GAAP violations, Lugano's financial results for fiscal years 2022 through 2024 were distorted; (v) the Company failed to remedy its defective internal controls over its financial reporting; (vi) as a result of the foregoing, the Company's financial results for fiscal years 2022 through 2024 were materially misstated; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

11.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Sabo, Faulkingham, and Keller, among others, in the United States District Court for the Central District of California, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

12.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Compass' Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

14.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     In connection with the acts, conduct and other wrongs complained of herein, the

Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because the Company is headquartered in this District, Defendants conduct business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Compass common stock.

### Nominal Defendants

20.     Nominal Defendant Compass Diversified Holdings (referred to herein as the "Trust") is a Delaware statutory trust with its principal executive offices located at 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880. The Trust's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CODI."

21.     Nominal Defendant Compass Group Diversified Holdings LLC (referred to herein as the "LLC") is a Delaware limited liability company with its principal executive offices located at 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880. The LLC is the operating entity with a board of directors who oversee the management of the Company and its businesses and the performance of Compass Group Management LLC. The LLC houses the various companies that form the businesses that make up Compass.

22.     Nominal Defendant Compass Group Management LLC (referred to herein as the

"Manager") is a Delaware limited liability company. The Manager manages Compass, and the Company pays the Manager management fees, which includes compensation paid to Compass' executive management, all of whom are all employees of the Manager.

***Individual Defendants***

23.    Defendant Sabo was a founding partner of the Manager and has served as the CEO and as a director of the Company since May 2018. According to the Company's public filings, Defendant Sabo owns equity in the Manager and receives compensation from the Manager. According to the proxy statement filed by the Company on a Schedule 14A with the SEC on April 14, 2025 (the "2025 Proxy"), the Manager estimates that Defendant Sabo received the following in compensation in connection with his role as CEO during the Relevant Period:

| Year | Estimated Compensation |
|------|------------------------|
| 2023 | $4,500,000 |
| 2024 | $5,500,000 |

24.    Defendant Faulkingham served as the Chief Financial Officer ("CFO") and Co-Compliance Officer of the Company from November 2013 until August 30, 2024. Faulkingham also served as an employee of the Manager during the Relevant Period. According to the Company's public filings, Defendant Faulkingham received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $1,117,449 |
| 2024 | $1,447,049 |

25.    Defendant Keller has served as CFO of the Company since August 31, 2024. Keller is also an employee of the Manager. According to the Company's public filings, Defendant Keller received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2024 | $490,866 |

26.     Defendant Maciariello has served as the Chief Operating Officer ("COO") of the Company since 2005. Maciariello also serves as an employee of the Manager.

27.     Defendant Bhathal has served as a director of the Company since January 2022. Bhathal also serves as a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Bhathal received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $210,000 |
| 2024 | $267,213 |

28.     Defendant Bottiglieri has served as a director of the Company since December 2005. Bottiglieri also serves as a member of the Company's Audit Committee and Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Bottiglieri received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $230,000 |
| 2024 | $267,213 |

29.     Defendant Burns served as a director of the Company from May 2008 until June 2025. According to the Company's public filings, Defendant Burns received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $220,000 |
| 2024 | $277,213 |

30.     Defendant Edwards has served as a director of the Company since 2006. Edwards also serves as Chair of the Company's Compensation Committee and as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Edwards received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $220,000 |
| 2024 | $277,213 |

31.     Defendant Enterline has served as a director of the Company since July 2019 and as Chair of the Board since July 2022. According to the Company's public filings, Defendant Enterline received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $290,000 |
| 2024 | $342,131 |

32.     Defendant Mahon has served as a director of the Company since May 2023. Mahon also serves as Chair of the Company's Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Mahon received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $101,466 |
| 2024 | $267,213 |

33.     Defendant Shaffer has served as a director of the Company since May 2023. Shaffer also serves as Chair of the Company's Audit Committee. According to the Company's public filings, Defendant Shaffer received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $230,000 |
| 2024 | $307,213 |

34.     Defendant Simon has served as a director of the Company since May 2023. Simon also serves as a member of the Company's Audit Committee and Compensation Committee. According to the Company's public filings, Defendant Simon received the following compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $78,913 |
| 2024 | $267,213 |

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

35.     By reason of their positions as officers and/or directors of Compass, and because of their ability to control the business and corporate affairs of Compass, the Individual Defendants owed Compass and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Compass in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Compass and its shareholders.

36.     Each director and officer of the Company owes to Compass and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Compass, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Compass were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and/or officers of Compass, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Compass were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Compass were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Connecticut and the United States, and pursuant to Compass's own Code of Ethics (the "Code of Ethics");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting

the Company's assets, and to maximize the value of the Company's stock;

       (iii)    Remain informed as to how Compass conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Compass and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Compass's operations would comply with all applicable laws and Compass's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

       42.    Each of the Individual Defendants further owed to Compass and the shareholders

the duty of loyalty requiring that each favor Compass's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Compass and were at all times acting within the course and scope of such agency.

44.     Because of their advisory, executive, managerial, and directorial positions with Compass, each of the Individual Defendants had access to adverse, non-public information about the Company.

45.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Compass.

## COMPASS' CODE OF ETHICS

46.     The Company's Code of Ethics states that it applies to:

[T]he principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions (collectively, the "*Covered Officers*" each of whom is set forth on Exhibit A attached hereto) directors, officers, and employees of Compass Group Diversified Holdings LLC (the "*Company*") as well as all officers and employees of Compass Group Management LLC (the "*Manager*") involved in the oversight of the day to day operations of the Company and its subsidiaries.

47.     The Code of Ethics also states that "[t]he principal executive officer, principal financial officer and principal accounting officer or controller, or persons performing similar functions of each of the Company's subsidiaries are covered by separate code(s) of ethics approved by the board of directors of such subsidiaries."

48.     The Code of Ethics states that its purpose is to promote:

A) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

B) full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "*SEC*") and in other public communications made by the Company and its subsidiaries;

C) compliance with applicable governmental laws, rules and regulations;

D) the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code;

E) avoidance of conflicts of interest, including disclosure to an appropriate person or persons identified in the Code of any material transaction or relationship that reasonably could be expected to give rise to such a conflict;

F) accountability for adherence to the Code; and

G) an enforcement mechanism for compliance with the Code.

49.    Under a section titled "Compliance with Laws," the Code of Ethics states:

All actions taken by the Company and the Covered Persons, without exception and wherever they may be acting, must be in compliance with the laws, rules and regulations (including insider trading laws) applicable to the Company and its subsidiaries.

Covered Persons are expected to comply with the laws of the country in which they operate as well as United States' laws and the Company's policies governing its business activities. These laws and policies include, without limitation, compliance with the U.S. Foreign Corrupt Practices Act, competition laws and anti-money laundering laws.

Anyone aware of any violation by any Covered Person, whether based on actual fact or reasonable grounds for suspicion, of any applicable law, rule or regulation, or of any provision of this Code, must immediately make a written report to the Company's Nominating and Corporate Governance Committee (the "*NCG Committee*").

50.    Under a section titled "Covered Persons Shall Handle Ethically Actual and Apparent Conflicts of Interest," the Code of Ethics states:

A) Overview. A "conflict of interest" occurs when a Covered Person's private interest interferes with the interests of, or his/her service to, the Company and its subsidiaries. For example, a conflict of interest would arise if a Covered Person, or

a member of his/her family, receives improper personal benefits as a result of his/her position in the Company and its subsidiaries.

Although typically not representing an opportunity for improper personal benefit, conflicts may arise from, or as a result of, the contractual relationship between the Company and the Manager, of which one or more Covered Persons are employees, officers or hold interests in, directly or indirectly. As a result, this Code recognizes that the Covered Persons will, in the normal course of their duties (whether for the Company and its subsidiaries or the Manager, or both), be involved in establishing policies and implementing decisions that will have different effects on the Company and its subsidiaries and the Manager. The participation of the Covered Persons in such activities is inherent in this contractual relationship and is consistent with the performance by the Covered Persons of their duties as officers and employees of the Company and its subsidiaries or as a provider of services to the Company and its subsidiaries. Thus, if performed in conformity with the provisions of this contractual agreement and with applicable laws and regulations, such activities will be deemed to have been handled in compliance with the Code.

Other conflicts of interest are also covered by the Code. Specifically, it is recognized by the Board of Directors of the Company (the "**Board**") that the Covered Officers may also currently, or in the future, serve as officers, employees or service providers of one or more public or private companies covered by other codes of ethics or conduct. The following list provides examples of conflicts of interest under the Code, but Covered Persons should keep in mind that these examples are neither exhaustive nor exclusive. The overarching principle is that the personal interest of a Covered Person should not be placed improperly before the interests of the Company and its subsidiaries.

B) <u>Each Covered Person must not</u>:

    (i)    Use his or her personal influence or personal relationships improperly to influence investment decisions or financial reporting by the Company and its subsidiaries whereby the Covered Person would benefit personally to the detriment of the Company and its subsidiaries;

    (ii)    cause the Company or its subsidiaries to take action, or fail to take action, for the individual personal benefit of the Covered Person rather than for the benefit of the Company and its subsidiaries;

    (iii)    use material non-public knowledge of transactions made or contemplated by the Company and its subsidiaries to trade personally or cause others to trade personally in contemplation of the market effect of such transactions; or

    (iv)    retaliate against any other Covered Person for reports of potential violations of the Code that are made in good faith.

51.    Under a section titled "Disclosure & Compliance," the Code of Ethics states, in relevant part:

Each Covered Person shall:

A) be familiar with the disclosure requirements generally applicable to the Company and its subsidiaries under applicable laws, including the federal securities laws and the rules and regulations promulgated thereunder;

B) not knowingly misrepresent, or cause others to misrepresent, facts about the Company and its subsidiaries to others, whether within or outside the Company and its subsidiaries, including to the Company's directors and auditors, and to governmental regulators and self-regulatory organizations;

C) to the extent appropriate within his or her area of responsibility, consult with other officers and employees of the Company and its subsidiaries with the goal of promoting full, fair, accurate, timely and understandable disclosure in the reports and documents the Company files with, or furnishes to, the SEC and in other public communications made by the Company; and

D) promote compliance with the standards and restrictions imposed by any applicable laws, rules and regulations.

52.    Under a section titled "Related Party Transactions," the Code of Ethics states, in relevant part:

A "related party transaction" is defined as those required to be disclosed pursuant to Item 404 of Regulation S-K. In order to maintain the highest standards of integrity in its business, the Company has adopted the following guidelines with respect to related party transactions:

A) Covered Persons shall ensure that any and all related party transactions are brought to the attention of the NCG Committee;

B) all related party transactions shall be considered and conducted in a manner such that no preferential treatment is given to any such dealing or transactions;

C) the NCG Committee will review and approve all related party transactions for potential conflicts of interest;

D) the Company may not enter into or engage in any related party transaction absent approval from the NCG Committee;

E) all related party transactions involving an acquisition from or a sale to an affiliate of the Manager, including any entity managed by an affiliate of the Manager, must be submitted to the NCG Committee for pre-approval and may include a fairness opinion from an independent third party to the NCG Committee; and

F) no Covered Person shall vote on any transaction with the Company or any of its subsidiaries in which he or she, directly or indirectly, is a party or has a financial interest or other material interest.

### COMPASS' AUDIT COMMITTEE CHARTER

53.     Compass' Audit Committee Charter states that the Audit Committee's purpose is "to assist the Board in fulfilling its oversight responsibility relating to the integrity of the Company's and its subsidiaries' financial statements, the accounting and financial reporting processes and the financial statement audits."

54.     In a section titled "Responsibilities and Authority," the Audit Committee Charter states, in relevant part:

> The primary function of the Committee is to oversee the Company's financial reporting and disclosure process, including oversight of management and independent auditors in the production of the Company's financial statement s, as well as all controls and procedures relating thereto.
>
> To fulfill this obligation, the Committee is entitled to rely on (i) the Company's management for the preparation and accuracy of the Company s financial statements; (ii) both management and the Company's internal auditors, or other third parties or personnel responsible for the internal audit function, for establishing effective internal controls and procedures to ensure the Company s compliance with accounting standards, financial reporting procedures and applicable laws and regulations; and (iii) the Company s independent auditors for an unbiased, diligent audit or review, as applicable, of the Company s financial statements and the effectiveness of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (the "**PCAOB**") and other procedures. The Committee has the ultimate authority and responsibility to select, evaluate and, where appropriate, replace the Company s independent auditors.
>
> In fulfilling the Committee's obligations hereunder, each member of the Committee shall be entitled to rely on (i) the integrity of those persons within and outside the

Company and management from which it receives information, (ii) the accuracy of the financial and other information provided to the Committee absent actual knowledge to the contrary (which shall be promptly reported to the Board), and (iii) statements made by the officers and employees of the Company and its subsidiaries or other third parties as to any information technology, internal audit and other non-audit services provided by the independent auditors to the Company.

While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with generally accepted principles ("*GAAP*") and applicable rules and regulation. These are the responsibilities of management and the independent auditors.

In carrying out its responsibilities, the Committee's policies and procedures shall be adapted, as appropriate, to best react to changing markets and regulatory environments. Nothing in this Charter shall be interpreted as diminishing or derogating the duties, responsibilities or obligations of the Board.

Subject to the requirements of the Operating Agreement, the Committee shall have the authority and responsibilities set forth below; provided, that the following list of duties is not exhaustive, and the Committee may, in addition, perform such other functions as may be necessary or appropriate for the carrying out of its duties.

**<u>Independent Auditors</u>**

1)      *Retention of Independent Auditors, Scope of Duties.* The Committee shall: (a) select and retain a firm or firms of independent registered public accountants to audit the annual financial statements, books, accounts, records, and internal controls over financial reporting of the Company and its subsidiaries, subject to ratification by the Company's shareholders of selection of the independent auditors; (b) approve the terms of compensation of such independent auditors (including negotiating and executing on behalf of the Company engagement letter(s) with such independent auditors); (c) discuss with the independent auditors all critical accounting policies and practices to be used in the audit, the overall audit strategy, scope and timing of the audit, and any significant risks identified during the auditors' risk assessment procedures; (d) oversee the work performed by the Company's independent auditors; and (e) terminate such independent auditors as it deems necessary or appropriate.

The independent auditors shall report directly to the Committee, and the Committee will be authorized to review and discuss with the independent auditors any audit problems or difficulties, including significant difficulties encountered by the Company's independent auditors during their audit work or any restrictions on the scope of their activities or access to required records, data and information, any disagreements that have arisen between management and the independent auditors

regarding financial reporting, and management's response to such difficulties or disagreements, and to resolve disputes between management and the independent auditors regarding the audit. . . .

## Financial Statements and Disclosure Matters

1)      Audit Report. The Committee shall review the Company's financial statements and discuss with the independent auditors: (a) any matters of concern arising in connection with audits of such financial statements, including any adjustments to such statements recommended by the independent auditors or any other results of the audits; (b) any significant changes in the Company's selection or application of accounting principles; (c) any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods; and (d) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

2)      *Annual Financial Information.* The Committee shall: (a) review and discuss with management and the independent auditors the annual audited financial statements, the form of the audit opinion to be issued by the auditors on the financial statements, and disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Annual Report on Form 10-K and in the Earnings Release; (b) recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K; and (c) prepare the report to shareholders required to be included in the Company's annual proxy statement under Item 407(d)(3)(i) of Regulation S-K.

*3)      Quarterly Financial Information.* The Committee shall (a) review and discuss with management and the independent auditors the Company's quarterly unaudited financial statements and reports from the independent auditors relating to: (i) all critical accounting policies and practices to be used; (ii) alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditors; and (iii) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences, including disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, in each case, prior to the filing of the Company's Quarterly Reports on Form 10-Q; and (b) recommend to the Board whether such financial statements should be included in the Company's Quarterly Report on Form 10-Q.

4)      *Earnings Announcements.* The Committee shall review and discuss with management and the Company's independent auditors the Company's earnings press releases, prior to public release, including, the types of information to be

included and the presentation thereof and the use of any pro-forma, adjusted or other non-GAAP financial information, and any financial or non-financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and the type of presentation to be made.

5)      *Internal Controls, CEO, CFO Certifications.* The Committee shall:

(a) review with the Company's Chief Executive Officer, Chief Financial Officer, management, the internal auditors or other personnel responsible for the internal audit function, and the independent auditors, the adequacy and effectiveness of the Company's and its subsidiaries' financial reporting processes, internal controls over financial reporting and disclosure controls and procedures, including any significant deficiencies and material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls, procedures, or service providers (such as the Manager or accountants) and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls or procedures;

(b) discuss with management and the Company's independent auditors changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's control over financial reporting; and

(c) review and discuss with management and the Company's independent auditors disclosures relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications made by the Company's Chief Executive Officer and Chief Financial Officer, or persons performing similar roles, to be included in or attached as exhibits to the Company's Annual Report on Form 10-K or Quarterly Report(s) on Form 10-Q, as applicable.

6)      *Other Communications with Auditors.* The Committee shall review and discuss with the Company's independent auditors any other matters required to be discussed by PCAOB Auditing Standards No. 1301, *Communications with Audit Committees*, and all other applicable requirements of the PCAOB and the SEC.

7)      *Critical Accounting Policies.* The Committee shall: (a) consider and review, as appropriate and in consultation with the independent auditors, the appropriateness and adequacy of the Company's critical financial and accounting policies, internal controls over financial reporting and, as appropriate, the internal controls of key service providers; (b) review management's responses to the independent auditors' comments relating to the foregoing policies, procedures and controls; and (c) take any necessary action in light of any material control

deficiencies.

## **Compliance Oversight**

1)      *Complaints and Concerns.* The Committee shall have responsibility for the establishment and oversight of processes and procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls over financial reporting or auditing matters, and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters, in each case, in accordance with the guidelines set forth in Annex B.

*2)      Ethics.* The Committee shall assist the Board in establishing and monitoring compliance with the ethical business practice standards of the Company and review with management (including counsel) and the Director of Internal Audit, the results of their review of compliance with applicable laws, regulations, listing standards, and the Company's Code of Ethics.

3)      *Violations.* The Committee shall be designated as and serve as the Qualified Legal Compliance Committee for the Company in accordance with the provisions of Section 307 of the Sarbanes-Oxley Act of 2002. Upon receipt of a report of evidence of a material legal violation, the Committee will notify the Board of such report, investigate and recommend appropriate measures to the Board. If the Company does not appropriately respond, the Committee may take further appropriate action, including notification to the SEC.

4)      *Legal Compliance.* The Committee shall consult, on an ongoing basis, with management, the independent auditors and counsel as to legal or regulatory matters affecting its responsibilities, as well as relevant tax, accounting and industry developments. The Committee shall review with management or any external counsel as the Committee considers appropriate, any legal matters (including the status of pending litigation) that may have a material impact on the Company and any material reports or inquiries from regulatory or governmental agencies. The Committee shall review with management the adequacy and effectiveness of the Company's procedures to ensure compliance with its legal and regulatory responsibilities.

5)      *Risk Oversight.* The Committee shall discuss with management, the independent auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements, accounting policies or internal control over financial reporting.

6)      *Cybersecurity.* The Committee shall review and discuss with management

emerging cybersecurity developments and threats, the Company's risk relating to cybersecurity and the Company's cybersecurity programs, policies, and practices, including its network security and information security policies and practices, risk mitigation strategies and the internal controls related to information security and cybersecurity.

7)      *Hiring Former Auditors.* The Committee shall oversee compliance with the guidelines set forth in Annex A relating to the Company's hiring of employees or former employees of the independent auditors who participated in any capacity in the audit of the Company's financial statements.

### Oversight of Company's Internal Audit Function

1)      *Internal Audit.* The internal auditor or internal audit service provider, as the case may be, shall report periodically to the Committee regarding any significant deficiencies in the design or operation of the Company's and its subsidiaries' internal control over financial reporting, material weaknesses in the internal control over financial reporting and any fraud (regardless of materiality) involving persons having a significant role in the internal control over financial reporting, as well as any significant changes in internal control over financial reporting implemented by management during the most recent reporting period of the Company.

2)      *Risk Oversight.* The Committee shall discuss with management, the internal auditor or internal audit service provider, as the case may be, and the independent auditor, the Company's major risk exposures (whether financial, operational or both) and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

3)      *Internal Audit Service Providers.* With respect to outsourcing internal audit services, the Committee shall engage, evaluate and terminate internal audit service providers and approve fees to be paid to such internal audit service providers. . . .

### Other. . . .

3)      *Reporting to the Board.* The Committee shall report its activities to the Board on a regular basis and make such recommendations with respect to the matters described above and other matters as the Committee may deem necessary or appropriate.

4)      *Annual Evaluation.* The Committee shall perform an annual self-evaluation of the Committee's performance and annually reassess the adequacy of and, if appropriate, propose to the Board, any desired changes to, this Charter.

### SUBSTANTIVE ALLEGATIONS

***The Company's Background***

55.     Formed in 2005, Compass Diversified Holdings is a statutory trust which owns all of the limited liability interests of the LLC, which is managed by the Manager.

56.     The Company acquires controlling interests in, and actively manages, businesses that the Company purports "(i) operate in industries with long-term macroeconomic growth opportunities, (ii) have positive and stable cash flows, (iii) face minimal threats of technological or competitive obsolescence, and (iv) have strong management teams largely in place."

57.     The Company alleges that it empowers its subsidiaries "to pursue their visions and deliver outsized growth innovation, superior execution, and a focus on the long term."

58.     The Company manages a number of consumer businesses, which it describes as "businesses that we believe capitalize on a valuable brand name in their respective market sector." As of December 31, 2024, the Company's portfolio of consumer businesses in which it owns a controlling business included, among others: (i) The Honey Pot Co., a premium package goods brand for herb-based products; (ii) BOA, the creator of the BOA Fit System, which is an outdoor, athletic, workwear, and bracing brand focused on performance improvements for athletes; and (iii) PrimaLoft, a leading provider of branded, high-performance synthetic insulation primarily used in consumer outerwear and accessories.

59.     On September 3, 2021, the Company acquired a majority stake in Lugano, which is a California-based leading designer, manufacturer, and marketer of luxury jewelry, for $265 million. The Company announced the acquisition to the public on September 7, 2021.

60.     The acquisition of Lugano resulted in a substantial increase in the management fees being paid to the Manager. In 2020, prior to the acquisition, the Company paid $35 million in management fees to the Manager. However, in 2022, following the acquisition of Lugano, the Company paid $63 million in management fees to the Manager.

61.     In 2024, Lugano began purchasing inventory from a vendor who is a related party through one of its executive officers. The related party transactions caused Lugano's revenue to drastically increase, resulting in Lugano becoming one of the Company's most profitable businesses. Indeed, for fiscal year 2024, Lugano's net revenue grew by over $162 million.

62.     Accordingly, the percentage of net revenue for Lugano that was accounted for in the Company's consolidated financial results also increased. For instance, Lugano's net revenue accounted for 21.4% of the Company's consolidated financial results for fiscal year 2024, a drastic increase from 10.5% in fiscal year 2022.

63.     Throughout the Relevant Period, the Individual Defendants repeatedly touted the Company's internal controls over financial reporting and assured investors that the Company's financial statements were accurate, and that there were "no material changes" to its internal controls over financial reporting.

### Materially False and Misleading Statements

64.     On March 1, 2023, the Company filed its annual report for 2022 on a Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K reported that Lugano's net sales for full-year 2022 were $201.5 million, an increase of $76.4 million, or 61%, from 2021.

65.     Additionally, the 2022 10-K assured investors that, "[t]here have not been any changes in the Company's internal control over financial reporting . . . during our fourth fiscal quarter to which this Annual Report on Form 10-K relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

66.     The 2022 10-K was signed by Defendants Sabo, Faulkingham, Bhathal, Bottiglieri, Burns, Edwards, Enterline, and Shaffer. The 2022 10-K was also accompanied by certifications made by Defendants Sabo and Faulkingham pursuant to the Sarbanes-Oxley Act of 2002 (the

"SOX Certifications"), wherein they attested to the accuracy of the 2022 10-K.

67.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for fourth quarter of 2022 (the "4Q22 Earnings Call"). During the question and answer section of the 4Q22 Earnings Call, in response to an analyst question on whether Compass "is still going to be heavily invested in [Lugano's inventory] because the return on growth at Lugano [has been significant]," Defendant Sabo stated, in relevant part:

> The answer is yes. I would tell you, and I mentioned this earlier, we have planned for a much more conservative growth plan with Lugano, and that has embedded in the overall guidance of the company. They're currently running dramatically ahead of where our growth plan would be . . . That requires us to invest capital.

> What we've seen and what we experienced over the course of our ownership is that if we invest $1 in inventory, that yields about an additional dollar of revenue. And that's sort of an incremental 40% margin, right, EBITDA margin. And as long as that trend continues, and we're able to get a 40% pretax return on invested capital on that inventory, we're going to continue to do it because we can't find opportunities like that very often to deploy our capital into.

> So the question will -- and what we look at on, frankly, a weekly and monthly basis is, are inventory investments continuing to yield the sales growth and are the relationships remaining consistent? And so far they are and they have over the course of our ownership. So we will continue to invest in the growth of Lugano . . . .

68.    On April 12, 2023, the Company filed its annual proxy statement on a Schedule 14A with the SEC (the "2023 Proxy"). The 2023 Proxy assured investors that the Board was effectively overseeing risks to the Company, stating, in relevant part:

> ***The Company's Board has overall responsibility for risk oversight***. In furtherance of this responsibility, during 2022, the Board added a director with risk oversight, and specifically, cybersecurity experience. The Company's general counsel presents, and the Board assesses, at least annually, the critical legal and regulatory risks associated with the businesses of the Company and each of its subsidiaries, the overall risk environment for the Company's business, as well as the steps taken by the appropriate management team, if any, to mitigate any such risks. ***The Board also performs a significant portion of its role in risk oversight through the audit committee. The audit committee charter provides that the audit committee shall assist the Board in fulfilling its oversight responsibility relating***

*to the evaluation of enterprise risk issues. In addition, the audit committee, pursuant to its charter, discusses with management, counsel, the vice president of internal audit and internal audit service providers, as the case may be, and the independent auditors, the Company's major risk exposures (whether financial, operational or both) and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.* The Company's internal audit department supervises the day-to-day risk management responsibilities of the Company through its internal audit review processes which are performed at the Company level, as well as at each Company subsidiary. The internal audit department tailors its review to provide enhanced evaluations in specific areas which have included, without limitation, fraud, cybersecurity, adequacy of insurance, gift and entertainment and other spending, and business continuity. Our internal audit team reports directly to the audit committee, which is comprised solely of independent directors. In addition, during each quarterly meeting of the audit committee, the members of the audit committee meet with the Company's vice president of internal audit and independent auditors, in each case, without management present, to discuss the specific areas of risk identified during the quarter, if any. The audit committee is authorized to utilize outside lawyers, internal staff, independent experts, and other consultants to assist and advise the committee in connection with its responsibilities, including the evaluation of the Company's major risk exposures. *The Company's management team, including Company counsel, regularly evaluates the risks inherent to the businesses of the Company's subsidiaries and reports the results of such evaluations to the full Board for consideration at least annually and more frequently if the particular facts and circumstances dictate*. The Board also oversees ESG matters generally as part of its oversight of our business strategy and risk management, and the Board's standing committees each oversee specific ESG matters that fall within their respective areas of responsibility. *For example, the audit committee has oversight responsibility of compliance with the organization's periodic reporting and disclosure obligations* and the nominating and corporate governance committee has responsibility for overseeing the organization's policies with respect to corporate social responsibility and global corporate citizenship, as well as ensuring that the Company maintains strong governance practices. The Board and its standing committees regularly discuss with management a variety of ESG topics that are significant to our business and stakeholders. *The Board believes that the foregoing processes for overseeing risk ensures that independent directors are aware of the Company's major risk exposures.* The Company's chief compliance officer reports directly to the CEO and briefs the board regularly on matters of ethics and compliance. In addition, if there are particular areas of exposure or applicable emerging areas of risk, for which directors do not already have expertise or familiarity, the Company leverages the expertise of management and/or outside advisors to provide training sessions to the Board. During fiscal year 2022, for example, our Board received specific training on the SEC's proposed rules regarding the Enhancement and Standardization of Climate-Related Disclosures for Investors.

(Emphasis added).

69.    With respect to the Company's Audit Committee, the 2023 Proxy stated, in relevant part:

> The audit committee is comprised entirely of independent directors who meet the independence requirements of the NYSE and Rule 10A-3 of the Exchange Act and includes two "*audit committee financial experts*," although only one such expert is required by applicable SEC regulations. Our audit committee, which has been established in accordance with Section 3(a)(58)(A) of the Exchange Act, is responsible for, among other things:
>
> - retaining and overseeing our independent accountants;
>
> - assisting the Board in its oversight of the integrity of our financial statements, the qualifications, independence and performance of our independent auditors and our compliance with legal and regulatory requirements;
>
> - reviewing and approving the plan and scope of our internal and external audit;
>
> - pre-approving any audit and non-audit services provided by our independent auditors;
>
> - approving the fees to be paid to our independent auditors;
>
> - reviewing with our chief executive officer, chief financial officer and independent auditors the adequacy and effectiveness of our internal controls;
>
> - reviewing and approving the calculation of the profit allocation payments, if any, to be made to the Allocation Member;
>
> - preparing the audit committee report to be filed with the SEC;
>
> - reviewing hedging transactions; and
>
> - reviewing and assessing annually the audit committee's performance and the adequacy of its charter.

70.    The 2023 Proxy also included a section on "Corporate Governance Guidelines and Code of Ethics," which stated:

Our Board has adopted corporate governance guidelines that set forth our corporate governance objectives and policies and govern the functioning of the Board. Our corporate governance guidelines are available on our website at www.compassdiversified.com and in print from us without charge upon request by writing to Investor Relations at Compass Group Diversified Holdings LLC, 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880.

We have also adopted a code of ethics that sets forth our commitment to ethical business practices. Our code of ethics applies to our directors and officers, including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions; it also applies to the officers and employees of our Manager involved in the oversight of the day-to-day operations of the Company and its subsidiaries. Our code of ethics is available on our website at www.compassdiversified.com and in print from us without charge upon request by writing to Investor Relations at Compass Group Diversified Holdings LLC, 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880. We intend to disclose any amendments to, or waivers from, our code of ethics by posting such information on our website listed above or by filing with the SEC a Current Report on Form 8-K, in each case, if such disclosure is required by rules of the SEC or the NYSE.

71.     The 2023 Proxy was solicited by Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, and Shaffer.

72.     On May 3, 2023, the Company filed a quarterly report for the period ended March 31, 2023, on a Form 10-Q with the SEC (the "1Q23 10-Q"). The 1Q23 10-Q reported that Lugano had net sales of $63.9 million during the first quarter of 2023, which was an increase of $16.9 million, or approximately 36%, from the first quarter of 2022.

73.     The 1Q23 10-Q also stated that "there have been no material changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

74.     The 1Q23 10-Q was signed by Defendant Faulkingham and was accompanied by SOX Certifications made by Defendants Sabo and Faulkingham, wherein they attested to the accuracy of the 1Q23 10-Q.

75.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2023 (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, Defendant Sabo attributed Lugano's recent success to the Company's investment in Lugano's inventory, stating, in relevant part:

> So when you think about capital allocation, I would say #1 priority within our firm is to fund the kind of high-return opportunities within our portfolio, and Lugano clearly kind of goes to the top of that list. You see that as we've been building inventory in the company, we've been generating and generated plus 30% growth rates in that company. I think there's a lot of runway to continue to invest there and have very high return on invested capital.

76.     On August 2, 2023, the Company filed its quarterly report for the period ended June 30, 2023, on a Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q reported that Lugano had net sales of $60.9 million for the second quarter of 2023, an increase of $21.9 million, or 46%, from the second quarter in 2022.

77.     The 2Q23 10-Q also again assured investors that "there have been no material changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

78.     The 2Q23 10-Q was signed by Defendant Faulkingham and was accompanied by SOX Certifications made by Defendants Sabo and Faulkingham, wherein they attested to the accuracy of the 2Q23 10-Q.

79.     On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"). During the 2Q23 Earnings Call, Defendant Sabo credited Lugano's recent success to the Company's large investment in Lugano's inventory, stating, in relevant part:

A lot of the limitations on the growth of this business was really predicated on

investment, how much capital was available to put new salons in place? How much capital was available for inventory to create these pieces?

And so when we partnered with Moti to kind of drive this business forward, we were able to solve a lot of those capital issues. And what you've seen is an acceleration in the company's growth because of that. We don't view this as temporary, and we don't view the kind of growth opportunity as being limited right now. And in fact, we're seeing some of the programs that we're putting in place and some of the additional tie-ins that we have around our customer segment, it's only accelerating and strengthening kind of the community effect and the purchase of kind of product ultimately and profitability of this business.

80.    On November 2, 2023, the Company filed its quarterly report for the period ended September 30, 2023, on a Form 10-Q with the SEC (the "3Q23 10-Q"). The 3Q23 10-Q reported that Lugano had net sales of $78.8 million for the third quarter of 2023, which constituted an increase of 27.6 million, or approximately 54%, from the third quarter of 2022.

81.    Additionally, the 3Q23 10-Q again stated that "there have been no material changes in our internal control over financial reporting . . . during our most recently completed fiscal quarter, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

82.    The 3Q23 10-Q was signed by Defendant Faulkingham and was accompanied by SOX Certifications made by Defendants Sabo and Faulkingham, wherein they attested to the accuracy of the 3Q23 10-Q.

83.    Also on November 2, 2023, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2023 (the "3Q23 Earnings Call"). During the 3Q23 Earnings Call, Defendant Sabo assured investors that "Lugano is going to continue at these growth rates," and further stated, in relevant part, "if [Lugano] continues with growth rates, which frankly are just torrid at this point, look, it could get to the point where its sheer size starts to kind of exceed what our diversification sort of efforts would look like. The

company is going to continue at these growth rates."

84.    Also during the 3Q23 Earnings Call, Defendant Faulkingham discussed Lugano's growth, stating, in relevant part:

> Year-to-date, Lugano has consumed $139 million in working capital to fund its inventory growth, which has generated exceptional return on invested capital and enabled the strong year-to-date growth rate we have experienced. We expect to continue to monetize working capital across the business in Q4 with the exception of Lugano as we continue to fund its growth objectives.

85.    On February 28, 2024, the Company filed its annual report for fiscal year 2023 on a Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K reported that Lugano had net sales of $308.3 million for 2023, an increase of $106.8 million, or approximately 53%, from 2022.

86.    The 2023 10-K also again assured investors that "[t]here have not been any changes in the Company's internal control over financial reporting . . . during Compass's fourth fiscal quarter to which this Annual Report on Form 10-K relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

87.    The 2023 10-K was signed by Defendants Sabo, Faulkingham, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon. The 2023 10-K was also accompanied by SOX Certifications made by Defendants Sabo and Faulkingham, wherein they attested to the accuracy of the 2023 10-K.

88.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for fourth quarter of 2023 (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Sabo stated, in relevant part:

> Lugano once again delivered remarkable growth producing 53% annual revenue growth and 65% adjusted EBITDA growth.
>
> As we have repeatedly mentioned, Lugano has created a very innovative and disruptive business model within the high jewelry industry. We continue to fund capital investment to expand the company's footprint and inventory position,

realizing exceptionally strong returns on invested capital that is fueling the company's rapid growth.

89.    Also during the 4Q23 Earnings Call, Defendant Faulkingham highlighted Lugano's

growth, stating, in relevant part:

> In addition, we prefunded Lugano with significant inventory early in the first quarter of 2024 in preparation for the London salon opening, which is planned in the second quarter, and thus, we anticipate our leverage will increase during the first and second quarter, then decline sequentially in the third and fourth quarter as a result of strong growth we expect in our subsidiary adjusted EBITDA. . . .
>
> During 2023, Lugano invested $157 million in inventory to fund its growth. This inventory investment has generated an exceptional return on invested capital and enabled the strong growth Lugano has experienced.

90.    On April 10, 2024, the Company filed a proxy statement on a Schedule 14A with

the SEC (the "2024 Proxy"). The 2024 Proxy again assured investors that Compass' Board and

management was effectively overseeing risks to the Company, stating, in relevant part:

> Our Board recognizes the importance of effective risk oversight to the organization's continued success and in fulfilling its fiduciary responsibilities to the Company and its shareholders. The members of the Company's senior leadership team, including our Chief Executive Officer, Co-Chief Compliance Officers, General Counsel, Chief Financial Officer, Senior Vice President of Internal Audit, and the Chief Operating Officer and Vice President and Director of ESG of our Manager, are responsible for the day-to-day management of risk, and the regular reporting to the Board or the appropriate committee, regarding the Company's major risk exposures (such as strategic and competitive risks, financial risks, brand and reputation risks, cybersecurity and technology risks, legal and compliance risks, regulatory risks, ESG risks, and operational risks) and the steps management has taken to monitor and control such exposures. Our Board is responsible for promoting an appropriate culture of risk management throughout the organization, overseeing our aggregate risk profile and monitoring how the Company addresses specific risks. In furtherance of this responsibility, the Board has continually added directors with general risk oversight experience, and specific expertise in areas such as cybersecurity, sustainability and global corporate citizenship.
>
> Our General Counsel updates the Board regularly on material legal and regulatory matters and presents, and the Board assesses, at least annually, the critical legal and regulatory risks associated with the business of the Company and each of its subsidiaries, the overall risk environment for the Company's business, as well as

the steps taken by the appropriate management team, if any, to mitigate such risks. The Board also performs a significant portion of its role in risk oversight through the Audit Committee. The Audit Committee charter provides that the Audit Committee shall assist the Board in fulfilling its oversight responsibility relating to the evaluation of enterprise risk issues and regularly discuss with management, counsel, the internal audit leadership and internal audit service providers, as the case may be, and the independent auditors, the Company's major risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies. The Company's internal audit department reinforces the day-to-day risk management responsibilities of the Company's senior leadership team through its internal audit review processes which are performed at the Company level, as well as at each Company subsidiary. The internal audit department tailors its review to provide enhanced evaluations, on a rotating basis, in specific areas which have included, without limitation, fraud, cybersecurity, adequacy of insurance, gift and entertainment and other spending, offsite satellite office controls, and business continuity. Our internal audit team reports directly to the Audit Committee, which is comprised solely of independent directors. In addition, during each quarterly meeting of our Audit Committee, the members of the Audit Committee meet with the Company's Senior Vice President of Internal Audit, independent auditors and counsel, in each case, without management present, to discuss the specific areas of risk identified during the quarter, if any.

The Audit Committee is authorized to utilize outside lawyers, internal staff, independent experts, and other consultants to assist and advise the committee in connection with its responsibilities, including the evaluation of the Company's major risk exposures. The Company's Co-Chief Compliance Officers regularly, and no less than quarterly, brief the Audit Committee, who in turn reports to the full Board on matters of ethics and compliance.

In addition, if there are particular areas of exposure or applicable emerging areas of risk, for which directors do not already have expertise or familiarity, the Company leverages the expertise of management and/or outside advisors to provide training sessions to our Board. For example, during fiscal year 2022, our Board received specific training from an outside third party regarding the SEC's proposed rules regarding the Enhancement and Standardization of Climate-Related Disclosures for Investors and during fiscal year 2023, our Board received specific training from an outside third party regarding the SEC's proposed rules on Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure by Public Companies, in each case, prior to the adoption of such rules. Such trainings were in addition to the regular trainings provided to our Board and executive management team regarding business ethics, anti-corruption, and cyber awareness.

91.    The 2024 Proxy also stated the following with respect to Compass' Audit Committee:

The Audit Committee is comprised entirely of independent directors who meet the independence requirements of the NYSE and Rule 10A-3 of the Exchange Act. Ms. Shaffer, Mr. Bottiglieri and Mr. Edwards served on our Audit Committee for all of fiscal year 2023 and Ms. Locke Simon joined the Audit Committee on July 5, 2023. All of the foregoing individuals continue to serve on our Audit Committee. Mr. Bottiglieri served as chair of our Audit Committee until April 1, 2023, at which point Ms. Shaffer took over the role. Ms. Shaffer continues to serve as chair of our Audit Committee. The Board has determined that three of the four members of the Audit Committee, Ms. Shaffer, Mr. Bottiglieri, and Ms. Locke Simon, qualify as "audit committee financial experts" as defined under applicable SEC rules. The Audit Committee met seven times during 2023. All Audit Committee members attended over 90% of the Audit Committee's meetings during 2023.

Our Audit Committee, which has been established in accordance with Section 3(a)(58)(A) of the Exchange Act, is responsible for, among other things:

- overseeing the Company's financial reporting and disclosure process, including oversight of management and independent auditors in the production of the Company's financial statements, as well as all controls and procedures relating thereto;

- selecting, engaging and approving the fees charged or proposed to be charged by the Company's independent auditors;

- pre-approving any audit and non-audit services to be performed by the Company's independent auditors;

- evaluating the qualifications, performance and independence of the Company's independent auditors;

- reviewing the Company's quarterly and annual audited financial statements and reports from internal and external auditors and recommending to the Board whether such financial statements should be included in the periodic reports filed with the SEC;

- reviewing with the Company's Chief Executive Officer, Chief Financial Officer and personnel responsible for the internal audit function and independent auditors the adequacy and effectiveness of the Company's internal controls over financial reporting;

- reviewing and discussing with the Company's independent auditors any matters required to be discussed by the Public Company Auditing Oversight Board and other applicable requirements of the SEC;

- consulting with the independent auditors, as appropriate regarding the Company's critical financial and accounting policies;

- overseeing the processes and procedures for the receipt, retention and treatment of submissions received by the Company regarding accounting, internal accounting controls over financial reporting or auditing matters;

- assisting the Board in establishing and monitoring compliance with the ethical business practice standards of the Company;

- consulting, on an ongoing basis, with management, independent auditors and counsel as to legal or regulatory matters, as well as relevant tax, accounting and industry developments;

- reviewing and discussing with management cybersecurity threats and developments and the Company's cybersecurity risk, programs, policies, practices, and risk mitigation strategies;

- overseeing the Company's internal audit function;

- discussing with management, internal audit personnel and the Company's independent auditors the Company's major risk exposures (whether financial, operational or both) and the steps management has taken to monitor and control such exposures;

- reviewing and approving derivative transactions, if any, to be entered into by the Company;

- reviewing and approving the calculation of any profit distribution payment due to the holders of the Allocation Interests in the Company;

- reviewing and discussing with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for and disclosures of its significant related person transactions;

- preparing the Audit Committee report to shareholders required to be included in the Company's annual proxy statement; and

- reviewing and assessing annually the Audit Committee's performance and the adequacy of its charter.

92.    With respect to the Company's Code of Ethics, the 2024 Proxy stated:

Our Board has adopted corporate governance guidelines that set forth our corporate governance objectives and policies and govern the functioning of the Board.

We have also adopted a code of ethics that sets forth our commitment to ethical business practices. Our code of ethics applies to our directors and officers,

including our principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions, as well as the officers and employees of our Manager involved in the oversight of the day-to-day operations of the Company and its subsidiaries. We intend to disclose any amendments to, or waivers from, our code of ethics by posting such information on our website listed below or by filing with the SEC a Current Report on Form 8-K, in each case, if such disclosure is required by rules of the SEC or the NYSE.

Our corporate governance guidelines and code of ethics are available on our website at www.compassdiversified.com and in print from us without charge upon request by writing to: Investor Relations at Compass Group Diversified Holdings LLC, 301 Riverside Avenue, Second Floor, Westport, Connecticut 06880.

93.    The 2024 Proxy was solicited by Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon.

94.    On May 1, 2024, the Company field its quarterly report for the period ended March 31, 2024, on a Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q assured investors that the Company's disclosure controls were effective, stating, in relevant part, that "the Trust's Regular Trustees and the Chief Executive Officer and Chief Financial Officer of the LLC concluded that the Trust's and the LLC's disclosure controls and procedures were effective as of March 31, 2024."

95.    The 1Q24 10-Q was signed by Defendant Faulkingham and was accompanied by SOX Certifications made by Defendants Sabo and Faulkingham, wherein they attested to the accuracy of the 1Q24 10-Q.

96.    On the same day, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). The 1Q24 Earnings Release reported that the Company's net sales for the first quarter of 2024 had increased 8% year-over-year to $524 million, that its adjusted earnings had increased 73% year-over-year to $34 million, and that its adjusted EBITDA had increased 28% year-over-year to $94.8 million. The 1Q24 Earnings Release attributed the Company's increased net sales as driven by the 61% increase in Lugano's net sales during the first quarter of 2024, and attributed Compass' increased Adjusted

EBITDA to Lugano's "strong results."

97.    Defendant Sabo was quoted in the 1Q24 Earnings Release as stating that Lugano had a "great first quarter[]" and that, as a result, "we are feeling optimistic and raising our outlook."

98.    Also on May 1, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, in response to a question on why the Company's "confidence level is so high" in Lugano's ability to continue at its "large growth rate," Defendant Maciariello stated, in relevant part, that the Company is "investing significantly in inventory as you can see and as we told you" and that the Company is "more and more getting the right pieces in the right places at the right time to be sold."

99.    On July 31, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024 (the "2Q24 Earnings Release"). The 2Q24 Earnings Release reported that:

> **Second Quarter 2024 Financial Summary vs. Same Year-Ago Period (where applicable)**
> - Net sales up 11% to $542.6 million and up 6% on a pro forma basis. . . .
> - Adjusted Earnings, a non-GAAP financial measure, was up 36% to $39.8 million vs. $29.2 million.
> - Adjusted EBITDA, a non-GAAP financial measure, was up 27% to $105.4 million.

100.    The 2Q24 Earnings Release stated that the Company's increased sales were driven by "continued strong sales growth at Lugano." The 2Q24 Earnings Release further reported that Lugano had over $99 million in sales for the second quarter of 2024, an increase of 21% from the same quarter in 2023, and that Lugano had adjusted EBITDA of over $36 million for the second quarter of 2024, an increase of approximately 46% from the same quarter in 2023.

101.    Defendant Sabo was also quoted in the 2Q24 Earnings Release as stating, in

relevant part, that "Lugano continued to grow at an extraordinary pace."

102.    On the same day, the Company filed its quarterly report for the period ended June 30, 2024, on a Form 10-Q with the SEC (the "2Q24 10-Q"). In addition to including the same financial results as the 2Q24 Earnings Release, the 2Q24 10-Q also stated that there had "been no material changes in Compass's internal control over financial reporting."

103.    The 2Q24 10-Q further stated that "the Trust's Regular Trustees and the Chief Executive Officer and Chief Financial Officer of the LLC concluded that the Trust's and the LLC's disclosure controls and procedures were effective as of June 30, 2024."

104.    The 2Q24 10-Q was signed by Defendant Faulkingham and was accompanied by SOX Certifications made by Defendants Sabo and Faulkingham, wherein they attested to the accuracy of the 2Q24 10-Q.

105.    Also on July 31, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, in response to a question on whether the Company had a "rule of thumb around inventory investment translating" to sales for Lugano, Defendant Sabo stated, in relevant part:

> Yes, Matt, it's basically remained similar to where it's been. I would say we do have some additional investment we're making upfront. As our growth rate is actually accelerating, which is really remarkable given how fast this business has been growing. But as it's accelerating, it actually requires a little bit more upfront capital, especially as we're expanding our footprint. And for example, going to London, now being international, it creates some challenges about moving inventory that kind of required a little bit more investment.
>
> So in general, I would say the numbers are sticking exactly where they have been historically. And as we look at the business, I mean, part of the question that Pat said on your -- or answer Pat did for your question on modeling, I mean, the level of inventory investment also is a kind of component to modeling out how large and fast this business will grow. We've said this for 3 years, and I know it's hard for everybody and for us, too, to accept a little bit that as we put in more inventory,

there is kind of demand within our network. And as we're growing that network of buyers for, there's additional demand that is there. And so we are creating more revenue opportunity with inventory investment.

I think that continues and that has not slowed down. And so as we look into 2025, other than a desire to be a little bit more conservative and not get out over our skis, I would say there's nothing present right now that says this business should have a material change in sort of kind of its performance and growth outlook, it's going to be the kind of same thing. It's getting the people onboarded, getting kind of the product and the inventory built, those are sort of some of the constraints right now that we have to grow. It feels like demand still is solidly more within our network than what we're currently satisfying.

106.    On October 30, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). The 3Q24 Earnings Release reported that:

**Third Quarter 2024 Financial Summary vs. Same Year-Ago Period (where applicable)**
- Net sales up 11.8% to $582.6 million and up 6.6% on a pro forma basis. . . .
- Adjusted Earnings, a non-GAAP financial measure, up 65% to $48.7 million vs. $29.6 million.
- Adjusted EBITDA, a non-GAAP financial measure, was up 28% to $114.0 million vs. $89.0 million.

107.    The 3Q24 Earnings Release reported that Lugano had adjusted quarterly EBITDA of $51 million and sales growth of $119 million for the third quarter of 2024. The 3Q24 Earnings Release also stated that the Company's increased net sales were driven by "continued strong sales growth at Lugano" and that the increase in adjusted EBITDA was "primarily due to strong results at Lugano. . . ."

108.    On the same day, the Company filed its quarterly report for the period ended September 30, 2024, on a Form 10-Q with the SEC (the "3Q24 10-Q"). In addition to affirming the same financial results as reported in the 3Q24 Earnings Release, the 3Q24 10-Q also stated that "there have been no material changes in our internal control over financial reporting . . . during

our most recently completed fiscal quarter."

109.    The 3Q24 10-Q also stated that "the Trust's Regular Trustees and the Chief Executive Officer and Chief Financial Officer of the LLC concluded that the Trust's and the LLC's disclosure controls and procedures were effective as of June 30, 2024."

110.    The 3Q24 10-Q was signed by Defendant Keller and was also accompanied by SOX Certifications made by Defendants Keller and Sabo, wherein they attested to the accuracy of the 3Q24 10-Q.

111.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, in response to an analyst question asking Defendant Maciariello to clarify how Lugano's growth continued to "defy expectations" and to identify "key drivers of growth," Defendant Maciariello stated, in relevant part:

> So I'm only going to say that all salons did increase year-over-year. I'm not going to kind of touch on kind of salon by salon or area by area where the growth was. But the organic salons -- or the existing salons continue to grow and perform really well.
>
> We do continue to see a march up in sort of our average transaction value which is driving a decent chunk of growth. We also see an increase in our number of transactions per quarter. So it's a little of each, if that makes sense. And I'm sorry I can't be more in-depth than that. But it's a little of each.
>
> And really, it goes to -- we believe Lugano fundamentally has a different business model, and we believe it's disruptive. I mean we are offering more value to the consumers than are any of Lugano's competitors. And we believe that that's important whether you're dealing with -- whether you're dealing with people of any demographic, right? And so that's important for people of the highest demographic as well.
>
> We're creating long-term relationships and we're really allowing them to look at jewelry as more of a store of wealth. So we think it's a combination of all those things, right? And clearly, you see our investments in inventory. You need to have diamonds in order to sell diamonds, right? And that's part of what we're doing as well. And we're getting turns on that, and we're getting a very good return on our

investment . . . .

[A]s we grow and as we get more scale and as we add more capabilities and more talent in management, we're clearly buying at least as effectively, if not more effectively, number one.

112.    On February 27, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2024 (the "4Q24 Earnings Release"). The 4Q24 Earnings Release reported that:

> **Fourth Quarter 2024 – Financial Highlights (vs Q4 2023)**
> - Net sales were $620.3 million, up 13.8%. . . .
> - Subsidiary adjusted EBITDA, a non-GAAP financial measure, was $140.9 million up 25%. . . .
> - Adjusted EBITDA, a non-GAAP financial measure, was $118.2 million, up 29.0%. . . .
>
> **Fourth Quarter and Full Year 2024 Financial Results**
>
> Net sales in the fourth quarter of 2024 were $620.3 million, up 13.8% compared to $544.9 million in the fourth quarter of 2023. For the full year 2024, net sales were $2.2 billion, up 11.9% compared to $2.0 billion a year ago. Growth was driven by the Company's acquisition of The Honey Pot Co. in January 2024 and ***continued strong sales growth at Lugano*** and BOA. . . .
>
> Adjusted Earnings (see "Note Regarding Use of Non-GAAP Financial Measures" below) for the fourth quarter of 2024 was $46.6 million compared to $34.7 million a year ago. For the full year 2024, Adjusted Earnings was $161.6 million compared to $101.2 million a year ago.  . . .
>
> Adjusted EBITDA (see "Note Regarding Use of Non-GAAP Financial Measures" below) in the fourth quarter of 2024 was $118.2 million, up 29% compared to $91.6 million in the fourth quarter of 2023. For the full year 2024, Adjusted EBITDA was $424.8 million, up 30% compared to $326.5 million a year ago. ***The increases were primarily due to strong results at Lugano***.

(Emphasis added).

113.    The 4Q24 Earnings Release also reported that Lugano had adjusted quarterly EBITDA of $66 million and net sales of $150 million for the fourth quarter of 2024.

114.    On the same day, the Company filed its annual report for 2024 on a Form 10-K

with the SEC (the "2024 10-K"). In addition to stating the financial results included in the 4Q24 Earnings Release, reported that Lugano's net sales for 2024 were $470.6 million and that its adjusted EBITDA for 2024 was approximately $94.4 million.

115.    The 2024 10-K also stated that "[t]here have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during our fourth fiscal quarter."  The 2024 10-K further stated that "[o]ur management assessed the effectiveness of our internal control over financial reporting as of December 31, 2024. . . .Based on our assessment under this framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2024."

116.    The 2024 10-K was signed by Defendants Sabo, Keller, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon. The 2024 10-K was also accompanied by SOX Certifications made by Defendants Sabo and Keller, wherein they attested to the accuracy of the 2024 10-K.

117.    Also on February 27, 2025, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2024 (the "4Q24 Earnings Call"). During the 4Q24 Earnings Call, Defendant Maciariello stated that Lugano's "exceptional results" could be attributed to Lugano's "disruptive business model."

118.    On April 14, 2025, the Company filed the 2025 Proxy with the SEC. The 2024 Proxy again assured investors that Compass' Board and management was effectively overseeing risk to the Company, stating, in relevant part:

> Our Board recognizes the importance of effective risk oversight to the organization's continued success and in fulfilling its fiduciary responsibilities to the Company and its shareholders. Our organization's Enterprise Risk Management Committee, which is comprised of members of the Company's management team

in the functional areas of Internal Audit, Legal/Compliance, Finance, Operations and Investment is responsible for the day-to-day management of risk, and the regular reporting to the Board, or the appropriate committee, regarding the Company's major risk exposures (such as strategic and competitive risks, financial risks, brand and reputation risks, cybersecurity and technology risks, legal and compliance risks, regulatory risks, environmental, social and governance risks, and operational risks) and the steps management has taken to monitor and control such exposures. Our Board is responsible for promoting an appropriate culture of risk management throughout the organization, overseeing our aggregate risk profile and monitoring how the Company addresses specific risks. In furtherance of this responsibility, the Board has continually added directors with general risk oversight experience, and specific expertise in areas such as cybersecurity, sustainability and global corporate citizenship.

Our General Counsel regularly updates the Board on material legal and regulatory matters and presents, and the Board assesses, at least annually, the critical legal and regulatory risks associated with the business of the Company and each of its subsidiaries, the overall legal and regulatory risk environment for the Company's business, as well as the steps taken by the appropriate management team, if any, to mitigate such risks.

Our Board also performs a significant portion of its role in risk oversight through the Audit Committee. The chair of the organization's Enterprise Risk Management Committee regularly updates the Audit Committee on material enterprise risk issues and presents, and the Audit Committee assesses, at least annually, the Company's and its subsidiaries' major risks exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies and procedures.

The Company's internal audit department reinforces the day-to-day risk management responsibilities of the Company's leadership team through its internal audit review processes which are performed at the Company level, as well as at each Company subsidiary. The internal audit department tailors its review to provide enhanced evaluations, on a rotating basis, in specific areas which have included in prior years, fraud, cybersecurity, adequacy of insurance, gift and entertainment and other spending, offsite satellite office controls, and business continuity.

The Company's internal audit team reports directly to the Audit Committee, which is comprised solely of independent directors. In addition, during each quarterly meeting of our Audit Committee, the members of the Audit Committee meet with the Company's Senior Vice President of Internal Audit, independent auditors and counsel, in each case, without management present, to discuss the specific areas of risk identified during the quarter, if any.

The Audit Committee is authorized to utilize outside lawyers, internal staff,

independent experts, and other consultants to assist and advise the committee in connection with its responsibilities, including the evaluation of the Company's major risk exposures. The Company's Chief Compliance Officer regularly, and no less than quarterly, briefs the Audit Committee, who in turn reports to the full Board, on matters of ethics and compliance that arise during the quarter.

In addition, if there are particular areas of exposure or applicable emerging areas of risk, for which directors do not already have expertise or familiarity, the Company leverages the expertise of management and/or outside advisors to provide training sessions to our Board. For example, during fiscal year 2024, our Board received training from an outside service provider regarding data privacy and cybersecurity. Such training was in addition to the regular training provided to our Board and executive management team throughout the year regarding business ethics, anti-corruption, and cyber awareness.

119.    With respect to the Audit Committee, the 2025 Proxy stated, in relevant part:

Ms. Shaffer, as chair, Mr. Bottiglieri, Ms. Locke Simon and Mr. Edwards have served on our Audit Committee since our 2024 Annual Meeting of Shareholders. Our Board determined that each member of the Audit Committee is "independent" and "financially literate" under the NYSE Listing Rules and the SEC rules and regulations applicable to audit committees, and that each of Ms. Shaffer, Mr. Bottiglieri, and Ms. Locke Simon is an "audit committee financial expert" under applicable SEC rules. The Audit Committee met six times during 2024. All Audit Committee members attended 100% of the Audit Committee's meetings during 2024.

The responsibilities of the Audit Committee are included in its written charter, which can be found on our website at the above link. Among other duties, our Audit Committee, which has been established in accordance with Section 3(a)(58)(A) of the Exchange Act, is responsible for:

- selecting retaining, terminating and overseeing our independent auditor;

- assisting our Board in fulfilling its oversight responsibilities relating to the integrity of our financial statements, our compliance with legal and regulatory requirements, our adherence to policies regarding ethics and business practices and our enterprise risk-management practices;

- approving, or pre-approving, all audit and permissible non-audit services of our independent auditor;

- reviewing, in conjunction with management and our independent auditor the effectiveness of our accounting and internal control functions and procedures;

- reviewing the Company's quarterly and annual audited financial statements

and reports from internal and external auditors and recommending inclusion of such financial statements in the periodic reports filed with the SEC;

- overseeing the processes and procedures for the receipt, retention and treatment of submissions received by the Company regarding accounting, internal accounting controls over financial reporting or auditing matters;

- assisting our Board in fulfilling its oversight responsibilities with respect to cybersecurity threats and developments and the Company's cybersecurity risk programs, policies, practices and risk mitigation strategies;

- overseeing the Company's internal audit function; and

- reviewing and approving the calculation of any profit allocation payment due to the holders of the Company's allocation interests.

120.    Additionally, with respect to the Code of Ethics, the 2025 Proxy stated, in relevant part:

We have also adopted a code of ethics that sets forth our commitment to ethical business practices. Our code of ethics is available on our website at: **ir.compassdiversified.com/corporate-governance/governance-overview**. Our code of ethics applies to all of our directors and officers, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, as well as the officers and employees of our Manager involved in the oversight of the day-to-day operations of the Company and its subsidiaries. Our code of ethics can only be amended by the approval of a majority of our Board, including a majority of our independent directors. We intend to disclose any amendments to, or waivers from, our code of ethics by posting on our website or by filing with the SEC a Current Report on Form 8-K, in each case, if such disclosure is required by rules of the SEC or the NYSE.

121.    The 2025 Proxy was solicited by Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon.

122.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company's internal controls over its financial reporting were defective; (ii) as a result, the Company's publicly issued

financial statements contained material errors; (iii) Lugano violated Generally Accepted Accounting Principles ("GAAP") in its financing, accounting, and inventory practices during fiscal years 2022 through 2024; (iv) as a result of these GAAP violations, Lugano's financial results for fiscal years 2022 through 2024 were distorted; (v) the Company failed to remedy its defective internal controls over its financial reporting; (vi) as a result of the foregoing, the Company's financial results for fiscal years 2022 through 2024 were materially misstated; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

123.    The truth was revealed on truth was revealed on May 7, 2025, when the Company issued the May 7 Press Release and revealed that Lugano's CEO, Mordechai Ferner, had resigned and that the Company's investors should no longer rely on management's previously issued financial statements for the 2024 fiscal year. Specifically, the May 7 Press Release revealed that Compass' Audit Committee had launched an investigation after the Company's leadership was "made aware of concerns and about how Lugano was potentially financing inventory."

124.    The May 7 Press Release stated, in relevant part:

Compass Diversified (NYSE: CODI) ("CODI") today disclosed nonreliance on its financial statements for fiscal 2024 amid an ongoing internal investigation into its subsidiary, Lugano Holding, Inc. It also announced that it intends to delay the filing of its first quarter 2025 Form 10-Q.

The Audit Committee of CODI's Board of Directors promptly launched an investigation after CODI's senior leadership was made aware of concerns about how Lugano was potentially financing inventory. The investigation, led by outside counsel and a forensic accounting firm, is ongoing but has preliminarily identified irregularities in Lugano's non-CODI financing, accounting, and inventor practices. After discussing with senior leadership and investigators, the Audit Committee of CODI's Board has concluded that the previously issued financial statements for 2024 require restatement and should no longer be relied upon.

Effective May 7, 2025, Lugano's founder and CEO, Moti Ferder, resigned from all of his positions at Lugano and will not receive any severance compensation.

125.    Also on May 7, 2025, the Company filed a Current Report on a Form 8-K with the SEC (the "May 7 Form 8-K"). The May 7 Form 8-K included the May 7 Press Release as an exhibit and further explained, in relevant part, that:

> In April 2025, the Audit Committee of Board of Directors (the "Audit Committee") of Compass Group Diversified Holdings LLC ("CODI," or the "Company") commenced an internal investigation into the financing, accounting, and inventory practices of Lugano Holding, Inc. ("Lugano"), a subsidiary and operating segment of the Company, based on concerns reported to Company management as to these practices. Upon being notified of the concerns, Company management immediately informed the Audit Committee, and the Audit Committee promptly retained outside legal counsel to assist in conducting the investigation. Outside legal counsel in turn retained a forensic accounting firm to provide technical accounting guidance and analysis, as well as to assist with inventory review (outside legal counsel and the forensic accounting firm, collectively, the "Advisors"). . . .
>
> On May 7, 2025, after considering the advice and recommendations of the Company's management and the Advisors, and discussion with the Company's independent registered accounting firm, Grant Thornton LLP, the Audit Committee concluded that the Company's consolidated financial statements and other financial information for the fiscal year ended December 31, 2024 should no longer be relied upon due to the materiality of the preliminary findings of the investigation described above. Any previously issued or filed reports, press releases, earnings releases and investor presentations or other communications describing the Company's consolidated financial statements and other related financial information covering the fiscal year ended December 31, 2024 should also no longer be relied upon. The Company is in the process of evaluating the impact of these matters on internal control over financial reporting and expects to report one or more additional material weaknesses in internal control over financial reporting.

126.    The May 7 Form 8-K also revealed that "[i]n connection with the ongoing investigation and non-reliance on financial statements disclosed in Item 4.02, on May 7, 2025 the Board of Directors elected to postpone the annual meeting of stockholders previously scheduled for May 29, 2025 until a later date."

127.    On this news, the Company's stock price fell $10.70 per share, or approximately 62%, to close at $6.55 per share on May 8, 2025.

*Post-Relevant Period Events*

128.    On June 25, 2025, Compass filed a Current Report on a Form 8-K with the SEC (the "June 25 Form 8-K"). The June 25 Form 8-K revealed that Compass' Audit Committee's investigation confirmed additional irregularities in Lugano's accounting practices during the 2022 and 2023 fiscal years, and that, as a result, the Company's financial statements for 2022 and 2023 fiscal years could no longer be relied upon. Specifically, the June 25 Form 8-K stated, in relevant part:

> As the Investigation has progressed, the Advisors observed and confirmed to the Audit Committee that the identified irregularities also existed during fiscal years 2022 and 2023. Accordingly, on June 18, 2025 the Audit Committee, after consultation with the Company's management, the Advisors, and Grant Thornton, concluded that, in addition to the previously issued financial statements for fiscal year 2024 contained in the Company's Annual Report for December 31, 2024, the previously issued financial statements and other interim and full-year financial information for the fiscal years ended December 31, 2022 and December 31, 2023 should also no longer be relied upon, and that any previously issued or filed reports, press releases, earnings releases and investor presentations or other communications describing the Company's consolidated financial statements and other related financial information covering the fiscal years ended December 31, 2022 and December 31, 2023 should also no longer be relied upon. The Company is continuing to evaluate the impact of these matters on internal control over financial reporting for the fiscal years ending December 31, 2022, 2023, and 2024, and expects to report one or more material weaknesses in internal control over financial reporting.

*Share Repurchases*

129.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase nearly 899,000 shares of its own stock, for a total of over $18.9 million during the Relevant Period.

130.    According to the Company's quarterly and annual reports filed on Forms 10-Q and 10-K with the SEC, Compass made the following repurchases of its own stock during the Relevant

Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| March 1, 2023 to March 31, 2023 | 210,000 | $18.64 | $3,914,000 |
| April 1, 2023 to April 30, 2023 | 45,000 | $18.79 | $845,550 |
| May 1, 2023 to May 31, 2023 | 25,000 | $19.99 | $499,750 |
| June 1, 2023 to June 30, 2023 | 26,800 | $20.06 | $537,608 |
| August 1, 2023 to August 31, 2023 | 15,000 | $20.81 | $312,150 |
| September 1, 2023 to September 30, 2023 | 60,600 | $19.90 | $1,250,940 |
| November 1, 2023 to November 31, 2023 | 87,500 | $19.12 | $1,673,000 |
| December 1, 2023 to December 31, 2023 | 12,500 | $20.65 | $258,125 |
| November 1, 2024 to November 20, 2024 | 234,290 | $22.99 | $5,386,327.10 |
| December 1, 2024 to December 31, 2024 | 182,030 | $23.45 | $4,268,603.50 |

131.    Given that the price of Compass stock was $6.55 per share on May 8, 2025, after the corrective disclosures, the true value of the 898,720 repurchased shares was roughly $5,886,616. Accordingly, the Individual Defendants caused the Company to overpay by approximately $13 million to repurchase these shares during the Relevant Period.

### Harm to the Company

132.    As a direct and proximate result of the Individual Defendants' misconduct, Compass has lost and expended, and will lose and expend, millions of dollars.

133.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Sabo, Faulkingham, and Keller,

among others, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

134.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

135.    Additionally, during the Relevant Period, the Individual Defendants caused the Company to initiate the repurchases of its common stock that substantially damaged the Company.

136.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

137.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

138.    Plaintiff will adequately and fairly represent the interests of Compass and its shareholders in enforcing and prosecuting its rights.

139.    Compass is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

140.    Plaintiff is a current shareholder of Compass and has been a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

141.    A pre-suit demand on the Board of Compass is futile and, therefore, excused.  At the time this action was commenced, the eight-person Board consisted of Individual Defendants Enterline, Sabo, Bhathal, Bottiglieri, Edwards, Simon, Mahon, and Shaffer (the "Director

Defendants"). Accordingly, Plaintiff is only required to show that four of the Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

142.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

143.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

144.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

145.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of Compass, the Director Defendants knew, or

should have known, the material facts surrounding Compass's financial condition and internal control mechanisms.

146.    Defendant Sabo is not disinterested or independent. In addition to being a director, Defendant Sabo serves as CEO of Compass. Moreover, Defendant Sabo is one of the founding partners of the Manager and serves as an employee of the Manager. Thus, the Company admits that Defendant Sabo is a non-independent director. Furthermore, Defendant Sabo is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

147.    Director Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, and Shaffer each signed the 2022 10-K and Director Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon each signed the 2023 10-K and the 2024 10-K.

148.    Moreover, Director Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, and Shaffer each solicited the 2023 Proxy, which led to the reelection of Defendants Enterline, Bhathal, Bottiglieri, Burns, Edwards, Mahon, and Shaffer to the Board, allowing them to continue breaching their fiduciary duties to the Company.

149.    Director Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon each solicited the 2024 Proxy, which led to the reelection of Defendants Enterline, Bhathal, Bottiglieri, Burns, Edwards, Simon, Mahon, and Shaffer to the Board, allowing them to continue breaching their fiduciary duties to the Company.

150.    Director Defendants Sabo, Bhathal, Bottiglieri, Burns, Edwards, Enterline, Mahon, Shaffer, and Simon each solicited the 2025 Proxy, which led to the reelection of Defendants Enterline, Bhathal, Edwards, Simon, Mahon, and Shaffer to the Board, allowing them to continue

breaching their fiduciary duties to the Company.

151.    Accordingly, all of the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore excused.

152.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

153.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

154.    The Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

155.    Director Defendants Bottiglieri, Edwards, Shaffer, and Simon (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot

independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

156.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

157.    Accordingly, a pre-suit demand on the Board is futile and excused.

## <u>COUNT I</u>
### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9)

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

160.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

161.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides

that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

162.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*: (i) the Board and company management were not effectively overseeing risks to the Company, including risks associated with the Company's financial and public reporting; (ii) the Company's Audit Committee was not fulfilling its responsibilities with respect to oversight and financial reporting; and (iii) the Company's officers and directors were not adhering to the Code of Ethics.

163.    The misrepresentations and omissions in the 2023 Proxy, 2024 Proxy, and 2025 Proxy (collectively, the "Proxy Statements") were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Individual Defendants.

164.    Specifically, the materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Enterline, Bhathal, Bottiglieri, Burns, Edwards, Mahon, and Shaffer to the Board, thereby allowing them to continue breaching their fiduciary duties to Compass.

165.    The 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Enterline, Bhathal, Bottiglieri, Burns, Edwards, Simon, Mahon, and Shaffer to the

Board, thereby allowing them to continue breaching their fiduciary duties to Compass.

166. The 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Enterline, Bhathal, Edwards, Simon, Mahon, and Shaffer to the Board, thereby allowing them to continue breaching their fiduciary duties to Compass.

167. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy Statements.

168. Plaintiff, on behalf of Compass, has no adequate remedy at law.

### <u>COUNT II</u>
**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)**

169. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170. The Individual Defendants participated in a scheme with the purpose and effect of defrauding Compass. Not only is Compass now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Compass by the Individual Defendants.

171. During the Relevant Period, while the price of the Company's stock was artificially inflated, as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $13 million to repurchase approximately 899,000 shares of Compass common stock.

172. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases,

public statements, and periodic and current reports filed with the SEC.

173.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Compass not misleading.

174.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Compass.

175.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

176.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over approximately $18.9 million in the repurchase of Compass stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

177.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178.    Plaintiff, on behalf of Compass, has no adequate remedy at law.

**COUNT III**
**Against the Individual Defendants for Violations**
**of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))**

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Compass stock at prices artificially inflated by those materially false and misleading statements.

181.    Plaintiff, on behalf of Compass, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

184.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

185.    The Individual Defendants engaged in a sustained and systematic failure to properly

exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

186.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company's internal controls over its financial reporting were defective; (ii) as a result, the Company's publicly issued financial statements contained material errors; (iii) Lugano violated Generally Accepted Accounting Principles ("GAAP") in its financing, accounting, and inventory practices during fiscal years 2022 through 2024; (iv) as a result of these GAAP violations, Lugano's financial results for fiscal years 2022 through 2024 were distorted; (v) the Company failed to remedy its defective internal controls over its financial reporting; (vi) as a result of the foregoing, the Company's financial results for fiscal years 2022 through 2024 were materially misstated; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

187.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly

engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

188.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

189.   Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of thousands of shares of its own stock at artificially inflated prices before the fraud was exposed.

190.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

191.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

192.   Plaintiff, on behalf of Compass, has no adequate remedy at law.

## COUNT V
**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

193.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

195.    Plaintiff, on behalf of Compass, has no adequate remedy at law.

## COUNT VI
**Against the Individual Defendants for Unjust Enrichment**

196.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

197.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Compass.

198.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Compass that was tied to the performance or artificially inflated valuation of Compass, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

199.    Plaintiff, as a shareholder and representative of Compass, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other

compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

200.    Plaintiff, on behalf of Compass, has no adequate remedy at law.

**COUNT VII**
**Against the Individual Defendants for Waste of Corporate Assets**

201.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

203.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase approximately 899,000 shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

204.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

205.    Plaintiff, on behalf Compass, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: October 7, 2025

**LACHTMAN COHEN & BELOWICH LLP**

By:  */s/ Brian S. Cohen*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: vl@rl-legal.com
Email: lw@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

Brian S. Cohen
500 West Putnam Avenue, Suite 400
Greenwich, CT 06830
Telephone: (203) 404-4960
Email: bcohen@lcb-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Alden Sulger, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Compass Diversified Holdings common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed _____9/22/2025_____.

_____
Signed by:

*Alden Sulger*
D675CC30025F462...

Alden Sulger